# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **MARK BERGER,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| **v.** | )    **No. 4:18-CV-00047-PLC** |
| | ) |
| **NANCY A. BERRYHILL,** | ) |
| Deputy Commissioner Operations, | ) |
| Social Security Administration | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Mark Berger seeks review of the decision by the Deputy Commissioner of Operations, Social Security Administration, Nancy Berryhill ("Defendant"), denying his applications for Disability Insurance Benefits ("DIB") under the Social Security Act.[1] The Court has reviewed the parties' briefs and the administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the Court affirms Defendant's denial of Plaintiff's application.

### I.    Background & Procedural History

On April 18, 2016, Plaintiff, then fifty-one years old, filed an application for Disability Insurance Benefits alleging that he was disabled as of April 15, 2016 due to: fusion and deteriorating cervical neck vertebrae C1 to C7; severe and pinched nerves in the neck causing severe headaches; some paralysis, dizziness, with severe pain; and right shoulder trauma from torn rotator cuff surgery. (Tr. 145–46) The Social Security Administration ("SSA") denied

---

[1] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (2012). [ECF No. 9]

Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 75–79; 82–83). The SSA granted Plaintiff's request for review and conducted a hearing on July 7, 2017, at which Plaintiff appeared and testified. (Tr. 27–60)

In a decision dated August 29, 2017, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520(a) and concluded that Plaintiff "has not been under a disability within the meaning of the Social Security Act from April 15, 2016, through the date of this decision." (Tr. 15) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on November 24, 2017. (Tr. 143–44; 1–6) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106–07 (2000) (citing 20 C.F.R. §§ 404.900(a) (4)-(5), 404.955, 404.981, and 422.210(a)).

## II. Evidence before the ALJ

### A. Testimony at the ALJ Hearing

At the hearing, Plaintiff testified that he was fifty-one years old and had worked for more than twenty years as a journeyman carpenter. (Tr. 32, 48) He described his work in residential construction as encompassing various roles, most recently focusing on the installation of vinyl siding and managing a crew of carpenters. (Tr. 48–52) In these positions, Plaintiff performed heavy manual labor which entailed standing, climbing ladders, and regularly lifting between fifty and one hundred pounds of siding and other equipment. (Tr. 49)

Plaintiff testified that he had been aware of his congenital neck and back condition, diagnosed as Klippel-Fell cervical deformity, for most of his life, and Dr. Yoon had advised him fifteen years ago to stop working because of this condition. (Tr. 40) However, Plaintiff explained that he continued to work because: "I loved my job. I was a carpenter and I was a lead man. I ran

my own work and I had a family to support." (Tr. 40) Plaintiff testified that, after he injured his back and neck at home in April 2016, the pain rendered him unable to continue working as a carpenter. (Tr. 39–40)

In response to questions from the ALJ, Plaintiff described his condition as: an inability to move his neck and constant pain. (Tr. 34–35) Plaintiff explained that he took as many as six Percocet daily to control his pain. (Tr. 36)  Plaintiff also described some side effects from the Percocet, including drowsiness. (Tr. 36) Plaintiff explained that he had sought treatment for this condition from his primary care physician, Dr. Bain, and a neurosurgical specialist, Dr. Yoon. (Tr. 40–41) Dr. Yoon had recommended surgery, but Plaintiff had decided against the procedure because he was concerned about the risks. (Tr. 41–42)

At the hearing, Plaintiff also explained that he was able to drive, including to church twice a week and to Kansas City, with his wife, once every few months. (Tr. 33–34) Plaintiff explained that he was able to lift and carry about twenty to thirty pounds, roughly the weight of a bag of dog food, from his car to the house. (Tr. 36–37) Plaintiff testified that he was able to stand for about two hours and sit for thirty to forty minutes. (Tr. 37) Plaintiff also described needing to take a nap every day for one to two hours. (Tr. 38)

Plaintiff testified that, in a typical day, he performed household chores, including yard work. (Tr. 38) In response to the ALJ's question about an injury to Plaintiff's shoulder in February 2017 that occurred while attempting to stack firewood, Plaintiff responded that, "[t]he headaches was slacking off . . . I had things around my house to do. I had wood outside that I was wanting to re-stack . . . I only picked up little amounts, but I did it for like an hour . . . [t]he next day . . . I couldn't move my neck for two weeks." (Tr. 45–46)

A vocational expert, Karen Crist-Terrill, participated in the hearing via telephone. (Tr. 47) Ms. Crist-Terrill explained that Plaintiff's previous work installing siding was semi-skilled and required medium to heavy exertion. (Tr. 54) Ms. Crist-Terrill also classified Plaintiff's previous employment as a carpenter as a skilled occupation requiring heavy exertion. (Tr. 54)

In a question posed to the vocational expert, the ALJ described a hypothetical individual who:

> can lift up to 20 pounds occasionally; lift/carry up to ten pounds frequently; stand/walk for about six hours and sit for up to six hours in an eight-hour workday with normal breaks . . . can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. This hypothetical individual can occasionally balance, stoop, kneel, crouch, but never crawl. This hypothetical individual should avoid concentrated exposure to excessive vibration and . . . should avoid exposure to unprotected heights and exposure to hazardous machinery.

(Tr. 55) According to the vocational expert, this hypothetical individual could not perform any of the past work performed by the Plaintiff. (Tr. 55) But, such a hypothetical individual could perform "light/unskilled jobs" that were available in the national economy such as a routing clerk, a photocopy machine operator, or a shipping and receiving weigher. (Tr. 55–56)

The ALJ then modified the hypothetical question keeping the same limitations, but describing an individual who could "stand/walk for about six hours and sit up to four hours in an eight-hour workday." (Tr. 56) According to the vocational expert, the reduced ability to sit would not impact the availability of jobs, and this hypothetical individual could perform the three jobs identified in the previous hypothetical question. (Tr. 56) The ALJ again modified the hypothetical question to an individual who could stand/walk for four hours and sit for six hours. (Tr. 57) The vocational expert explained that the representative jobs that she had provided would still be available. (Tr. 57) In response to questions from counsel, the vocational expert opined

that a two-hour rest break "would be outside the normal standards allowed for break time so it would preclude employment." (Tr. 58)

B. Relevant Medical Records[2]

On March 21, 2016, Plaintiff called the office of Dr. Kelly Bain, his primary care physician, describing a severe headache and requesting an appointment that day to see Dr. Bain. (Tr. 253) Dr. Bain spoke with Plaintiff on the phone, but was unable to see him. (Tr. 253) Later that evening, Plaintiff presented to the emergency room at Mercy Hospital, where he saw Dr. Lawrence Prablek. (Tr. 250) Dr. Prablek noted that Plaintiff reported a headache lasting for four days and described the severity of his pain as a five out of ten. (Tr. 251) Dr. Prablek prescribed hydrocodone for Plaintiff's pain, but did not make a diagnosis. (Tr. 253)

Two days later, on March 23, 2016, Plaintiff saw Dr. Bain regarding his headaches. (Tr. 249, 460) Plaintiff described the pain as "throbbing, stabbing, and sharp," and rated the severity as a ten out of ten. (Tr. 249) Dr. Bain noted that pain medications, including hydrocodone, provided Plaintiff some pain relief. (Tr. 249) Dr. Bain diagnosed the headaches as torticollis (stiff neck) related to Plaintiff's degenerative disc disease. (Tr. 462) Dr. Bain prescribed Flexeril, administered a trigger point lidocaine injection, and scheduled a follow-up appointment. (Tr. 462–63)

A few weeks later, on April 5, 2016, Dr. Bain ordered an MRI of Plaintiff's cervical spine, which revealed several "congenital fusion anomalies in the cervical spine." (Tr. 452) A previous MRI performed in September 2014 had similarly found "multilevel congenital deformities of the cervical spine with near complete osseous fusion at C4-C5, C6-C7, and C7-

---

[2] Plaintiff's recitation of facts set forth in his Statement of Material Facts [ECF No. 19-1] admitted in their entirety by the Commissioner [ECF 26-1], includes several references to Plaintiff's December 2016 knee arthroscopy to treat complex tears in his medial meniscus. (Tr. 570–71; 557–58) This aspect of the ALJ's decision has not been appealed and is therefore not before this Court. As result, the records pertaining to Plaintiff's knee injury are not relevant and will not be included in this decision.

T11." (Tr. 461) The April 2016 MRI confirmed the previous findings, and Dr. Bain found Plaintiff's "degenerative disease [ ] relatively unchanged since the study of September of 2014." (Tr. 453) On April 7, 2016, Plaintiff saw Dr. Bain to follow-up on the MRI results. (Tr. 245) At this appointment, Plaintiff reported "shooting pain down the neck into the shoulder," such that "the pain [was] waking him up at night" and the pain medications were not providing relief. (Tr. 245) The pain had forced Plaintiff to leave work that week and he had not since returned to work. (Tr. 245)

On April 11, 2016, Dr. Bain referred Plaintiff to Dr. Peter Yoon, a neurosurgical specialist, for his ongoing neck pain and headaches. (Tr. 588) At the appointment with Dr. Yoon, Plaintiff described his pain as constant and rated its severity as a seven to eight out of ten. (Tr. 588) Dr. Yoon reviewed Plaintiff's MRIs and his medical history, and opined that Plaintiff's headaches "could be related to the degenerative changes" that resulted from Plaintiff's congenital disc deformity. (Tr. 594) Dr. Yoon recommended surgery, a cervical fusion, which, if performed, would "obviously exclude him from any type of gainful employment." (Tr. 594) Dr. Yoon also referred Plaintiff to a pain management specialist. (Tr. 594)

On April 13, 2016, Plaintiff saw Dr. Stephen Schmidt, a pain management specialist. (Tr. 516–21) Plaintiff described severe, throbbing neck pain that had "gotten worse with time," and made it difficult for him to move his neck. (Tr. 516) Dr. Schmidt recommended bilateral facet joint injections to provide pain relief. (Tr. 519) On April 21, 2016, Dr. Schmidt administered the first of these injections. (Tr. 522)

On April 25, 2016, Plaintiff saw Dr. Bain, and reported that his neck pain had worsened since their last appointment, rating his pain's severity as a ten out of ten. (Tr. 601)  Plaintiff reported that medications had been adequately controlling his pain "until he did some weed[-

eating] over the weekend." (Tr. 601) Plaintiff denied experiencing weakness, diminished grip strength, and lack of coordination. (Tr. 601) Dr. Bain reviewed imaging and observed developmental anomalies of the craniocervical junction and cervical spine including degenerative endplate disease and slightly dyplastic bony foramen. (Tr. 601) Dr. Bain diagnosed Plaintiff with degenerative disc disease and chronic intractable headaches of an unspecified type. (Tr. 602) Dr. Bain discussed with Plaintiff the option of surgery recommended by Dr. Yoon, noting that surgery "would completely disable [Plaintiff] in regards to his current job as a journeyman carpenter." (Tr. 602)

On May 4, 2016, Plaintiff had a follow-up appointment with Dr. Schmidt, at which he reported no improvement since his last visit and stated his pain severity as a ten out of ten. (Tr. 526) One week later, Plaintiff returned to Dr. Schmidt's office and reported that the injections performed by Dr. Schmidt had not relieved his pain, which he rated as an eight out of ten. (Tr. 532) At this appointment, Dr. Schmidt observed Plaintiff with a normal gait and stance, and full ranges of motion in the upper and lower extremities. (Tr. 535) Dr. Schmidt recommended selective epidural steroid injections. (Tr. 535)

On June 22, 2016, Dr. Bain referred Plaintiff to Dr. Neill Wright, a neurosurgeon, for a second opinion about the cervical fusion surgery recommended by Dr. Yoon. (Tr. 539) Dr. Wright's evaluation of Plaintiff's MRIs and X-rays confirmed Dr. Bain and Dr. Yoon's prior diagnosis of congenital fusions of O-C1, C2-C3, C5-C6, and C7-T2. (Tr. 540–41) Dr. Wright observed a severe limitation of the range of motion in Plaintiff's cervical spine. (Tr. 541) Dr. Wright discussed the surgical options with Plaintiff and advised him that "surgery would be very extensive." (Tr. 541) While Dr. Wright recommended surgery, he noted that Plaintiff's "risk of failed fusion is high." (Tr. 541–42)

On August 3, 2016, Plaintiff saw Dr. Bain again regarding his neck pain and headaches. (Tr. 611) Plaintiff reported that, with medication, his pain was a two out of ten and that he was not experiencing any side effects from the medication. (Tr. 611) Overall, Plaintiff reported that he was happy with his level of pain control and that his headaches had subsided. (Tr. 611) Plaintiff also reported numbness in his arms on three occasions. (Tr. 611) Plaintiff informed Dr. Bain that he had decided not to undergo the cervical fusion surgery recommended by Dr. Yoon. (Tr. 611)

On November 23, 2016, Plaintiff had another follow-up appointment with Dr. Bain regarding his chronic neck pain. (Tr. 630) Plaintiff rated his pain as an eight out of ten without medication, but five out of ten with medication. (Tr. 630) Dr. Bain noted that Plaintiff was not experiencing any side effects from the pain medication and that he was satisfied with his level of pain control. (Tr. 630) At a subsequent follow-up appointment on December 21, 2016, Plaintiff reported that the original dosing of medication was no longer controlling his pain, and that he required six Percocet per day. (Tr. 641)

At an appointment with Dr. Bain on February 20, 2017, Plaintiff reported that he had exacerbated his neck pain stacking wood the previous week. (Tr. 653) Plaintiff reported his pain levels were a nine out of ten while still, and a ten out of ten when moving. (Tr. 653) Dr. Bain noted that Plaintiff was taking three tablets of Percocet at a time, which brought his pain to a "tolerable" level. (Tr. 653)

After a referral from Dr. Bain, Plaintiff saw Dr. Jason Hahn, another pain specialist, on April 5, 2017. (Tr. 670) To Dr. Hahn, Plaintiff described his pain as an aching sensation in his neck, noted some numbness and tingling in his fingertips, and reported that his pain increased during physical activity and improved with inactivity and rest. (Tr. 671) Dr. Hahn's physical

exam revealed that Plaintiff had a full range of motion in all extremities without pain, and that Plaintiff's gait and station were stable. (Tr. 674) Dr. Hahn recommended a follow-up with Dr. Yoon to review surgical options and, alternatively, C1-C2 facet injections. (Tr. 677)

### C. Medical Source Statements

Dr. Bain first completed a Medical Source Statement (MSS), entitled "Physical Residual Functional Capacity Questionnaire," on August 8, 2016. (Tr. 544–52) There, she estimated that her treatment of Plaintiff began in 2000 and listed two diagnoses: spinal stenosis and congenital degenerative disc disease. (Tr. 544) Dr. Bain reported that Plaintiff's symptoms resulting from these conditions were: daily constant pain, headaches, and limited range of motion in the neck. (Tr. 544) Dr. Bain described Plaintiff's treatment, particularly pain medication, and explained that Percocet decreased Plaintiff's pain from a nine out of ten to a five out of ten. (Tr. 544) Dr. Bain noted that Plaintiff did not experience side effects from the pain medication. (Tr. 544) In an eight-hour work day, Dr. Bain estimated that Plaintiff could sit for about two total hours (in thirty-minute increments) and stand for about four total hours (in fifteen-minute increments). (Tr. 545) Dr. Bain also estimated that Plaintiff would need to take more than ten unscheduled breaks during an eight-hour workday as a result of his condition. (Tr. 546) Dr. Bain noted that Plaintiff could use his hands, fingers, and arms to grasp or turn objects for only 50% of an average workday. (Tr. 547) Finally, Dr. Bain explained that, over the past fifteen years, Plaintiff had been able to manage his symptoms with pain medication, but this treatment had become less effective over the last six months. (Tr. 548)

Dr. Bain completed a second MSS questionnaire on June 7, 2017. (Tr. 579–87)  In response to the question "[d]ate treatment began," Dr. Bain listed "April, 2016." (Tr. 579) Regarding Plaintiff's exertional limitations, Dr. Bain responded that Plaintiff could sit for about

two total hours (in thirty-minute increments) and stand for less than two total hours (in thirty-minute increments). (Tr. 580) Dr. Bain also stated that Plaintiff could never use his arms to reach for objects. (Tr. 582) Dr. Bain noted that Plaintiff could use his hands, fingers, and arms to grasp or turn objects for only 20% of an average workday, and for fine manipulation for 50% of an average workday. (Tr. 547) Finally, Dr. Bain explained that Dr. Wright recommended spinal fusion to address Plaintiff's pain, but that surgery would "markedly further reduce range of motion and function of neck." (Tr. 583)

### III.     Standards for Determining Disability Under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . " 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities; or (3) has an impairment which meets or exceeds one of the impairments listed in 20

C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

## IV.    The ALJ's Determination

In a decision dated August 29, 2017, the ALJ applied the five-step evaluation set forth in 20 C.F.R. Section 404.1520. (Tr. 17) The ALJ determined that Plaintiff (1) had not engaged in substantial gainful activity since April 15, 2016; (2) had the severe impairments of Klippel-Fell deformities with congenital fusion and degenerative joint disease of the cervical spine; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "[Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 17).

At step three, the ALJ concluded that Plaintiff had the residual functional capacity (RFC) to "perform light work as defined in 20 C.F.R. 404.1567(b)" which included that "[Plaintiff] can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch." (Tr. 18) The ALJ added the following limitations: "he should never be required to climb a ladder, rope, or scaffold. He should never be required to crawl . . . he should avoid concentrated exposure to vibration and he must avoid hazards, such as unprotected heights and dangerous machinery." (Tr. 18)

In making this finding, the ALJ considered Plaintiff's subjective reports of pain and concluded that Plaintiff's level of function and "objective evidence [did] not support the severity of [Plaintiff's] complaints." (Tr. 19) The ALJ also afforded the opinion of Plaintiff's primary care physician, Dr. Bain, minimal weight because "[her] own treatment records do not support

[her] statements." (Tr. 19) The ALJ explained that he discounted the opinion of Dr. Bain because "[she] has only been treating [Plaintiff] since April 2016 and [her] statements appear to be primarily based on the [Plaintiff's] subjective complaints." (Tr. 19)

At steps four and five of the sequential evaluation, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy. (Tr. 21–22) Specifically, the ALJ found, based on the testimony of the vocational expert, that Plaintiff could perform the jobs of routing clerk, shipping and receiving weigher, and photocopy machine operator. (Tr. 21) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 22)

## V.     Discussion

Plaintiff claims that substantial evidence does not support the ALJ's decision because the ALJ: (1) erred in affording minimal weight to Plaintiff's treating physician; (2) failed to properly consider Plaintiff's subjective reports of pain; and (3) erred by finding that Plaintiff's headaches were not a severe impairment. [ECF No. 19] Defendant counters that the ALJ: (1) properly considered the opinion of Plaintiff's physician; (2) properly evaluated Plaintiff's subjective pain; and (3) that substantial evidence supported the determination of the severity of Plaintiff's impairments. [ECF No. 26]

### A.  Standard for Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); see also Jones v. Astrue, 619 F.3d 963, 968 (8th Cir. 2010). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might find it adequate to support the conclusion." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Brown v. Colvin, 825 F.3d 936, 939 (8th Cir. 2016)). In determining whether the evidence is

substantial, a court considers evidence that both supports and detracts from the ALJ's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, "as long as substantial evidence in the record supports the [ALJ's] decision, [the Court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently." Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002)).

A court "do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); see also Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

B.  Treating Physician

Plaintiff contends that the ALJ erred by assigning minimal weight to the opinion of his treating physician, Dr. Bain, because "[t]he objective evidence, reported activities of daily living, and the [P]laintiff's testimony [were] all consistent and supportive of [Dr. Bain's] opinion." [ECF No. 19 at 4] Defendant counters that the ALJ properly considered Dr. Bain's opinion and gave it minimal weight because "the opinion consisted of a conclusory checkbox form, listed significant limitations that were not reflected in treatment notes or other medical records, and assigned more limitation than Plaintiff actually exhibited in daily living." [ECF No. 26 at 9–10]

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id. This notion is premised, at least in part, on the understanding that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. § 404.1527; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. § 404.1527(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ afforded the opinion of Plaintiff's primary care physician, Dr. Bain, "minimal weight" because the ALJ found that the limitations outlined in her MSS were "significantly out of proportion to [her] treatment notes." (Tr. 19) The ALJ also noted several specific inconsistencies between Dr. Bain's opinion and her notes, including Plaintiff's reported activities. (Tr. 19) The ALJ further explained that he believed that Dr. Bain's opinion was not entitled to controlling weight because "[she] has only been treating [Plaintiff] since April 2016 and [her] statements appear to be primarily based on the [Plaintiff's] subjective complaints." (Tr. 19)

First, the ALJ found inconsistencies between Dr. Bain's opinions, in her two MSS forms, and Plaintiff's medical records. For example, the ALJ cited Dr. Bain's notes from Plaintiff's visit on April 25, 2016 where Plaintiff denied numbness, tingling, or paresthesia[ ] in his upper extremities, and also denied weakness, diminished grip strength, and lack of coordination. (Tr. 19, 601) These notes from Dr. Bain are inconsistent with her June 2016 MSS conclusion that Plaintiff had limited grip strength and ability to use his upper extremities. (Tr. 547) "The Commissioner may . . . assign 'little weight' to a treating physician's opinion when it is . . . internally inconsistent." Thomas v. Berryhill, 881 F.3d 672, 675 (8th Cir. 2018) (quoting Chesser v. Berryhill, 858 F.3d 1161, 1164–65 (8th Cir. 2017)) See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given to his opinions.")

Next, the ALJ explained that Dr. Bain's notes, which referenced Plaintiff weed-eating and stacking wood, demonstrated Plaintiff's ability to perform some physical activity. Additionally, Plaintiff testified at the hearing that his typical day included performing yard work. (Tr. 38)  As a result, the ALJ concluded that these records were inconsistent with the limitations outlined in Dr. Bain's MSS. (Tr. 19) Activities of daily living that are inconsistent with a treating physician's opinion can "support[ ] the ALJ's decision not to accord [the physician's] opinion controlling weight." Reece v. Colvin, 834 F.3d 904, 910 (8th Cir. 2016); see also Thomas v. Berryhill, 881 F.3d 672, 676 (8th Cir. 2018) ("[Plaintiff's] self-reported activities of daily living provided additional reasons for the ALJ to discredit [the treating physician's] pessimistic views of her abilities."); Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017) (finding that inconsistent daily activities supported discounting the limitations outlined by a treating physician).

The ALJ also pointed to Plaintiff's appointment with Dr. Bain on August 3, 2016, at which Plaintiff reported that his headaches had subsided and that his pain, with medication, was a two out of ten. (Tr. 611) By contrast, Dr. Bain's MSS, completed five days later, on August 8, 2016, stated that medication improved Plaintiff's pain to a five out of ten. (Tr. 544) An ALJ may discount a physician's opinion when there are "significant inconsistencies between [a physician's] opinions as recorded on the MSS and the earlier medical evidence in the record." Adkins v. Comm'r, Soc. Sec. Admin., 911 F.3d 547, 550 (8th Cir. 2018) (citing Johnson v. Astrue, 628 F.3d 991, 994 (8th Cir. 2011)); see also Andrews v. Colvin, 791 F.3d 923, 929 (8th Cir. 2015) (finding inconsistency between treatment notes and MSS completed on the same day to be a "sufficient reason[ ] to discount [the treating physician's] opinion").

Additionally, the ALJ explained that he gave Dr. Bain's opinion minimal weight because her "statements appear to be primarily based on [Plaintiff's] subjective complaints." (Tr. 19) An ALJ may give the physician's opinion less deference when it is based on the claimant's "subjective complaints rather than any objective medical evidence, such as laboratory diagnostic results or referrals to specialists." Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016) (citing Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014)).

Finally, the ALJ explained that he gave minimal weight to Dr. Bain's opinion because "[she] has only been treating [Plaintiff] since April 2016." (Tr. 19) The record reflects, however, a longer and continuing treatment relationship between Plaintiff and Dr. Bain, dating back to at least 2009. Although a longer treatment relationship generally entitles a medical opinion to greater weight, 20 C.F.R. § 404.1527(c)(2)(i), the ALJ must consider the record as a whole when evaluating the weight of a physician's opinion. Chaney v. Colvin, 812 F.3d 672, 679 (8th Cir. 2016) ("Since the ALJ must evaluate the record as a whole, the opinions of treating

physicians do not automatically control."); Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ("A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."). Here, the ALJ's explanation of the inconsistencies between Dr. Bain's treatment notes and her opinion of Plaintiff's limitation in the MSS is sufficient reason to discount the weight given to Dr. Bain's opinion.

The Court notes that even though there is some evidence in the record that contradicts the ALJ's findings, "it is not the function of a reviewing court to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings." Adkins v. Comm'r, Soc. Sec. Admin., 911 F.3d 547, 550 (8th Cir. 2018) Rather, "[th]e test is whether there is substantial evidence on the record as a whole which supports the decision of the ALJ." Id. Here, the ALJ appropriately discounted Dr. Bain's MSS opinions because there was significant inconsistency between her description of Plaintiff's symptoms and limitations in the MSS and her own contemporaneous treatment records.

C. Subjective Pain

Plaintiff argues that the ALJ improperly evaluated his subjective reports of pain because the ALJ did not explain how the objective evidence failed to support the severity of Plaintiff's subjective complaints.[3] [ECF No. 19 at 5] Plaintiff also contends that the ALJ's evaluation of Plaintiff's functional activity was improper because the examples cited by the ALJ, such as stacking wood, demonstrated that "when [Plaintiff] tries to perform physical work he suffers

---

[3] The SSA issued a new ruling, effective March 28, 2016, that eliminates the use of the term "credibility" when evaluating a claimant's subjective statement of symptoms, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2 (SSA Oct. 2017). The factors to be considered in evaluating a claimant's statements, however, remain the same. See id; Schmidt v. Berryhill, No. 4:17 CV 2375 CDP, 2019 WL 339634, at *3 n.4 (E.D. Mo. Jan. 28, 2019). Because the ALJ's decision in this case was issued after March 28, 2016, SSR 16-3p applies to this matter.

from excorticating (sic) pain for days after." [ECF No. 19 at 6] Finally, Plaintiff argues that his ability to perform daily activities is not inconsistent with a finding of disability. [ECF No. 19 at 7]. Defendant counters that the ALJ's conclusions regarding the severity of Plaintiff's pain were supported by substantial evidence, including objective medical findings. [ECF No. 26 at 6–7] Additionally, Defendant argues that inconsistencies between Plaintiff's activities and his subjective reports of pain diminished the credibility of these complaints. [ECF No. 26 at 8]

For purposes of Social Security analysis, a "symptom" is an individual's own description or statement of his physical or mental impairments(s). SSR 16-3p, 2017 WL 5180304, at *2 (SSA. Oct. 2017). If a claimant makes statements about the intensity, persistence, and limiting effects of his symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. Id. at *8. See also 20 C.F.R. § 404.1529(c)(3) (explaining how the SSA evaluates symptoms, including pain).

When evaluating a claimant's subjective statements about symptoms, the ALJ must "give full consideration to all of the evidence presented relating to subjective complaints," including a claimant's work history and observations by third parties and physicians regarding: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also SSR 16-3p, 2017 WL 5180304, at *11.

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the [Plaintiff's] statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 18) In making this finding, the ALJ reasoned that Plaintiff's level of function was "inconsistent with a finding of disability." (Tr. 19) The ALJ then summarized Plaintiff's medical records, including several imaging tests of Plaintiff's spine. (Tr. 19) Based on these findings, the ALJ concluded that "the limitations in the residual functional capacity finding [were] . . . supported by the absence of sufficiently convincing evidence [that] the [Plaintiff] suffers from any debilitating condition that would prevent him from performing in light-duty occupations." (Tr. 20)

First, the ALJ, in finding that Plaintiff's level of function and daily activity was inconsistent with disabling pain, noted Plaintiff's ability to care for his dogs, prepare meals, shop, drive to church, and drive to Kansas City. (Tr. 19) Plaintiff is correct that an ability to perform sporadic, light activities does not demonstrate an ability to perform full-time, competitive work. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Hogg v. Shalala, 45 F.3d 276, 278–79 (8th Cir. 1995). However, daily activities that are inconsistent with a claimant's subjective reports may support an adverse determination regarding the credibility of a claimant's testimony. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013); Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) ("[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.") (quotation omitted).

Plaintiff's argues that the ALJ's interpretation of these daily activities is incorrect because on several occasions these activities exacerbated Plaintiff's back and neck pain. [ECF No. 19 at 6] However, the primary activities cited by the ALJ – such as, caring for two dogs, tending to personal grooming, preparing meals, performing household chores, driving, and shopping for household needs – are those which Plaintiff was able to perform on a regular basis.

(Tr. 19) Further, the ALJ acknowledged that Plaintiff's "cervical condition has obviously deteriorated to the point where he is unable to continue engaging in heavy-duty labor work," but concluded that Plaintiff's "self-reported level of activity indicates that he is still capable of less-demanding work." (Tr. 20) Thus, the ALJ's conclusion that Plaintiff was able to perform light work with some limitations is not undermined by occasions on which Plaintiff injured himself performing more strenuous tasks, such as stacking wood or weed-eating.

Second, the ALJ found that Plaintiff's complaints of pain were inconsistent with the evidence in the record as a whole. The ALJ noted that the Plaintiff's medical records were inconsistent with Plaintiff's subjective reports, for example, doctor's notes reporting that Plaintiff denied numbness, tingling, or paresthesia, weakness, diminished grip strength, or lack of coordination. (Tr. 19, 601) The ALJ also referenced a CT scan and an MRI, both taken in April 2016, as evidence that confirmed Plaintiff's diagnosis, but the ALJ qualified this finding by noting that the abnormalities in these images "only manifest in some degenerative endplate disease and a slightly dysplastic bony foramen." (Tr. 19) Although Plaintiff is correct that the ALJ's explanation here fails to fully explain why this qualification would undermine the credibility of Plaintiff's subjective pain, the ALJ's evaluation did not rely on this inconsistency. Rather, the ALJ based his determination on the record as whole.

Finally, the ALJ cited Dr. Bain's notes reporting that Plaintiff was satisfied with the level of pain control provided by medication, which reduced his pain to a two out of ten in August 2016. (Tr. 19, 611–12) "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Renstrom, 680 F.3d at 1066 (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)).

To the extent the ALJ did not specifically discuss each <u>Polaski</u> factor, the Court notes that an ALJ "need not methodically discuss each <u>Polaski</u> factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make." <u>Noerper v. Berryhill</u>, No. 1:17-CV-157-NCC, 2018 WL 4562909, at *4 (E.D. Mo. Sept. 24, 2018) (citing <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000)). Here, the ALJ pointed to objective medical evidence, Plaintiff's activities of daily living, and the effectiveness of medication in controlling Plaintiff's pain, all of which supported the ALJ's determination regarding the severity of Plaintiff's symptoms.

The Court therefore finds the ALJ properly considered the factors set forth in <u>Polaski</u> and SSR 16-3p and determined that the evidence in the record failed to support a greater limitation than found in the RFC. Thus, because the ALJ's determination to discredit Plaintiff's subjective complaints is supported by good reasons and substantial evidence, the Court defers to the ALJ's determination. <u>See, e.g.</u>, <u>Renstrom</u>, 680 F.3d at 1067; <u>Gonzales</u>, 465 F.3d at 894.

D.   <u>Severe Impairments</u>

The ALJ determined that Plaintiff had two medically determinable severe impairments: (1) Klippel-Fell deformities with congenital fusion and (2) degenerative disc disease of the cervical spine. (Tr. 17) Plaintiff contends that the ALJ erred in not finding that Plaintiff's headaches were also a severe impairment. [ECF No. 19 at 7] In particular, Plaintiff argues that by suggesting that Plaintiff's headaches had no specific etiology (Tr. 19), the ALJ failed to consider Dr. Yoon's suggestion that Plaintiff's atlanto-occipital assimilation could be the cause of his headaches. [ECF No. 19 at 7–8] Defendant counters that objective medical evidence supported the ALJ's findings and notes that Plaintiff's headaches were controlled by pain medication. [ECF No. 26 at 5] Additionally, Defendant contends the ALJ considered Plaintiff's

headaches as a symptom of his cervical condition and, as a result, "the ALJ properly evaluated the totality of Plaintiff's symptoms and limitations in determining the extent of their impact on his functional abilities." [ECF No. 26 at 6]

At step two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). See also 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is a medically determinable impairment that "significantly limits [the claimant's] physical or mental ability to do basic work activities."[4] 20 C.F.R. § 404.1521(a). Although the plaintiff has "the burden of showing a severe impairment that significantly limited [his] physical or mental ability to perform basic work activities[,] . . . the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). See also Kirby, 500 F.3d at 708 ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard[.]") (internal citation omitted).

Here, the ALJ recognized that Plaintiff had been diagnosed with chronic, intractable headaches, but noted that Plaintiff's headaches were of an "unspecified" nature and were not diagnosed as migraine headaches. (Tr. 19, 594, 602) Further, the ALJ considered notes from an appointment with Dr. Bain on August 3, 2016, where Plaintiff reported that his headaches had subsided and that his pain medication was effective. (Tr. 611)  As previously discussed, symptoms adequately controlled by medication are not disabling. Martise v. Astrue, 641 F.3d 909, 924 (8th Cir. 2011) (affirming a finding that the claimant's migraine headaches were not severe when the headaches were "controllable and amenable to treatment").

---

[4] Basic work activities include, among other things, physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling, as well as various mental and physical activities. 20 C.F.R. § 416.922.

Plaintiff is correct that the ALJ did not evaluate Dr. Yoon's suggestion that Plaintiff's atlanto-occipital assimilation (and related cervical fusion) could be the cause of Plaintiff's headaches. (Tr. 590). But here, if Dr. Yoon's explanation of the etiology of Plaintiff's headaches is correct (that Plaintiff's cervical fusion caused his headaches), the ALJ's subsequent categorization of Plaintiff's Klippel-Fell deformity (cervical fusion) as a severe impairment included and considered Plaintiff's headaches as a symptom. A failure to list a specific impairment at step two is not an error unless the impairment is "separate and apart" from the other listed impairments. Gragg v. Astrue, 615 F.3d 932, 939 (8th Cir. 2010). Here, Plaintiff's headaches are neither separate nor distinct from the severe impairments enumerated and considered by the ALJ.

Further, a court may find that an error at step two, in failing to find a particular impairment severe, does not require reversal where the ALJ finds other severe impairments and considers all of the claimant's impairments, severe and non-severe, in the subsequent analysis. Cuthrell v. Astrue, 702 F.3d 1114, 1118 (8th Cir. 2013). Here, the ALJ considered all of Plaintiff's impairments, including headaches, in formulating Plaintiff's RFC. As a result, even if the ALJ had listed headaches as a severe impairment, the outcome would have been the same. Thus, if the ALJ erred in not finding headaches to be a severe impairment at step two, such error was harmless because the ALJ considered all of Plaintiff's impairments, severe and non-severe, when formulating the RFC.

## VI.    Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

PATRICIA         L.              COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of April, 2019